# EXHIBIT A

# Commonwealth of Massachusetts

MIDDLESEX,SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. ___2481CV00001___

Jasmine Boyd–Perry _____, PLAINTIFF(S),

V.

Marblehead Public Schools DEFENDANT(S)
John Buckey and Nan Murphy

### SUMMONS

THIS SUMMONS IS DIRECTED TO Marblehead Public Schools ___ . (Defendant's name) 

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the
Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been
filed in the Middlesex Superior ___ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1.   **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide
     the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the
     opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect
     to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an
     extension of time in writing from the Court.**

2.   **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a
     copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
     a.   Filing your **signed original** response with the Clerk's Office for Civil Business, Middlesex Superior Court,
          200 Trade Center Dr. _____ (address), by mail or in person, **AND**
     Woburn, MA 01801
     b.   Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following
          address: 22 Mill Street, Suite 408, Arlington, MA 02476

3.   **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer
     must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint.
     Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to
     use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are
     based on the same facts or transaction described in the Complaint, then you must include those claims
     in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this
     lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your
     Answer or in a written demand for a jury trial that you must send to the other side and file with the
     court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a
     **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion
     to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If
     you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions"
     described in the rules of the Court in which the complaint was filed, available at
     www.mass.gov.courts/case-legal-res/rules of court.

4.   **Legal Assistance.** You may wish to get legal help from a lawyer.  If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.   **Required information on all filings:**  The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon~~orable~~ Heidi Brieger, Chief Justice on ___February 1___ , 20 _24_ .

_____Michael A. Sullivan_____
Michael A. Sullivan
Clerk-Magistrate

Note:  The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

        I hereby certify that on_____, 20____, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____
_____
_____

Dated:_____ , 20_____        Signature:_____

**N.B.    TO PROCESS SERVER:**

        **PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

| |
|---|
| , 20____ |

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX COUNTY**                  **SUPERIOR COURT DEPT.
OF THE TRIAL COURT
DOCKET NO.:**

| | |
|---|---|
| _____ ) | |
| JASMINE BOYD-PERRY                  ) | |
|                                     ) | |
|           Plaintiff                 ) | |
| v.                                  ) | |
|                                     ) | |
|                                     ) | |
| MARBLEHEAD PUBLIC SCHOOLS,          ) | 12/31/23 |
| JOHN BUCKEY AND NAN MURPHY          ) | |
|                                     ) | RECEIVED |
|                                     ) | |
|           Defendants                ) | |
| _____ ) | |

## COMPLAINT

The Plaintiff, JASMINE BOYD-PERRY ("Plaintiff"), sets forth below her/their Complaint against her/their former employer and supervisors, the Defendants, MARBLEHEAD PUBLIC SCHOOLS, FORMER SUPERINTENDENT JOHN BUCKEY and FORMER ASSISTANT SUPERINTENDENT NAN MURPHY ("Defendants") for her/their wrongful termination and disparate treatment. Set forth below are claims alleging violations of G.L. c. 151B, Title VII and the Family Medical Leave Act based on a racially hostile, discriminatory and retaliatory work environment created and facilitated by the Defendants.

## THE PARTIES

1. The Plaintiff, JASMINE BOYD-PERRY ("Plaintiff"), is an individual residing in Middlesex County, Massachusetts.

2. The Defendant, MARBLEHEAD PUBLIC SCHOOLS ("Defendant MPS"), is a Massachusetts public school located at 9 Widger Road, Marblehead, MA 01945.

3. The Defendant, JOHN BUCKEY ("Defendant JOHN BUCKEY"), is an individual residing at 9 Widger Road, Marblehead, MA 01945 and at all relevant times, was Superintendent of MPS and the supervisor of the Plaintiff during her/their tenure with Defendant MPS.

4. The Defendant, NAN MURPHY ("Defendant NAN MURPHY"), is an

individual residing at 9 Widger Road, Marblehead, MA  01945 and at all relevant times, was Assistant Superintendent of MPS and a supervisor of the Plaintiff during her/their tenure with Defendant MPS.

## FACTUAL ALLEGATIONS

5. The Plaintiff refers to the allegations of Paragraphs 1 through 4 and by such reference repleads and incorporates them as though fully set forth here.

6. The Plaintiff, a Black and Native/Indigenous non-binary female, was selected as the Director of METCO for the Defendant MPS during August 2019 through January 2021. She is an honors graduate of the University of Massachusetts Boston and has a graduate certificate in Nonprofit Management from Tufts University.  She has worked in dedicated fashion to develop a career advocating for diversity and inclusion.

7. Prior to her/their work for Defendant MPS, the Plaintiff excelled in her/their role as a Residential Director and Student Experience Assistant Manager for the Boston Ballet School for approximately two years.

8. During her/their tenure with Defendant MPS, the Plaintiff was the only Black female District Administrator and one of only two Black employees in the MPS system.

9. All of the Plaintiff's supervisors were White as were the majority of her/their co-workers and staff.

10. The METCO Program is a grant program funded by the Commonwealth of Massachusetts intended to expand educational opportunities, increase diversity, and reduce racial isolation by permitting students in certain cities, such as the City of Boston, to attend public schools in other communities, such as Defendant MPS, that have agreed to participate.

11. METCO has been in existence since 1966 and was originally funded through a grant by the Carnegie Foundation and United States Office of Education.

12. In that year the first METCO legislation was filed, METCO Inc. was established, and seven school districts began accepting the first two hundred METCO students.

13. Currently, there are about 3,300 students participating in 38 school districts, including MPS, in metropolitan Boston and at four school districts outside Springfield.

14. In leading the METCO program for Defendant MPS as Director of METCO, the Plaintiff reported directly to the Superintendent and Assistant Superintendent

and/or designees, Defendants John Buckey and Nan Murphy, respectively.

15. The Plaintiff's responsibilities included but are not limited to the following:

- advocating for METCO students in collaboration with the Defendant MPS;

- facilitating understanding of the issues of race and class and full inclusion for students;

- working with Defendant MPS staff so that they may effectively serve the educational and social needs of students who are not educated in their home community;

- working with Defendant MPS staff on the development of multicultural curriculum and the development of high academic expectations for children of color;

- working with superintendent, the assistant superintendent, principals, directors and teachers to develop programs that support the educational progress of METCO students;

- facilitating and serving as a liaison to professional development initiatives to assure that a racially and culturally inclusive perspective is reflected in classroom practice, school climate and curriculum;

- collaborating with the assistant superintendent, principals, the director of special education, program administrators and curriculum coordinators to address obstacles to equitable learning;

- formulating recommendations to increase student achievement and to facilitate program improvement;

- assisting with the development, management and implementation of the METCO Grant funding and other appropriate funding resources;

- preparing the annual METCO budget and administering its implementation;

- assisting in the implementation of new initiatives/practices that are deemed appropriate and/or necessary;

- working with students and parents to ensure that full educational access is integral to their academic experience;

- serving as liaison between Defendant MPS and METCO parents where appropriate;

- working with METCO Inc. to select and place students within the Defendant MPS district; and

- maintaining a relationship with METCO Inc.

16. To the Plaintiff's dismay, her/their efforts to fulfill the mission of her/their role as METCO Director were stifled and/or hampered by the Defendants in an environment pervaded by racial hostility, disparate treatment, discrimination, and microaggressions inflicted by both Defendants' administration and their staff.

## PLAINTIFF'S DISPARATE TREATMENT AND RACIALLY HOSTILE WORK ENVIRONMENT

## ADMINISTRATIVE CONDUCT

17. During the course of her/their tenure with Defendant MPS, the Plaintiff was subjected to terms and conditions of employment that were disparate from her/their White colleagues. Since approximately June of 2020 through her/their unlawful termination on January 4, 2021, the Plaintiff was disrespected, disregarded, intimidated, ignored, muted, talked over, harassed, humiliated, and isolated in the Defendant MPS workplace.

18. She was subjected to a multitude and pattern of racial microaggressions, which were manifested in a myriad of subtle ways by the Defendants. Indeed, even in her/their first meeting with Defendants Buckey and Murphy, a meeting held over Zoom and recorded with the Defendants' consent, the Plaintiff was treated in a condescending fashion and subjected to unwarranted hostile, derogatory, and negative comments.

19. Overall, this repeated derogatory treatment had a profoundly negative effect on the Plaintiff and continued throughout the Plaintiff's work with the Defendants. Such actions sought to diminish the value and humanity not only of the Plaintiff, but also the student population she was hired to serve.

20. The Defendants created and/or permitted a culture of fear and intimidation within the workplace that made it uncomfortable, unsafe and toxic for the Plaintiff to perform her/their work to fulfill the METCO mission, to advance diversity and effectively support her/their METCO students within the Defendant MPS district.

21. The Defendants subjected the Plaintiff to excessive performance monitoring and her/their differences of opinion were responded to with denigration by the Defendants.

22. The Plaintiff's compensation was also disparately treated from her/their White colleagues. During July 2020, the Defendants, under Defendant Buckey's administration (a new administration from the one that originally hired the Plaintiff), failed to timely provide her/their with a renewal contract and paperwork which

prevented her/them from being able to negotiate the contract terms, wages and/or conditions of the contract.

23. The Plaintiff was left with no other choice but to work outside of her contract and without compensation from the previous school year (2019-2020) given the prospect that the Defendants would not retain her/their services as METCO Director if she did not continue providing services during the summer of 2020.

24. The Defendants not only failed to compensate the Plaintiff during this time, but also refused to properly acknowledge the work she completed.

25. Per her/their contract, the Plaintiff was not required to work during the summer months/vacation of 2020.

26. Nonetheless, the Plaintiff was asked to work and rendered services during the entire summer with the exception of one week. While her/their White colleagues who performed such work were compensated and shown praise and appreciation, no such compensation or appreciation was provided to the Plaintiff. Instead, the Plaintiff was told by the Defendants that if she cared about her students, she should complete the work regardless of her/their compensation issues.

27. The Defendants also undermined the Plaintiff's leadership and authority in a manner disparate from her/their White peers. The Defendants, for example, permitted her/their subordinate employees to assign the Plaintiff tasks that were often not a part of her/their job requirements or role.

28. The Defendants also advised Plaintiff that while she/they would receive performance reviews by these staff members, a majority of whom are White, and subordinate to her/their leadership position, the Plaintiff would not be permitted to review their performance or that of any of her/their peers. The Plaintiff was also not allowed to evaluate her own direct reports.

29. The Plaintiff was also often bypassed by other staff who would directly communicate with the Plaintiff's superiors rather than the Plaintiff about the METCO program and its services. The Plaintiff was also excluded from meetings and/or intentionally not informed of meetings involving METCO or METCO students.

30. During the Plaintiff's tenure, on or about September 16, 2020, her/their confidential information was also improperly released and disseminated by the Defendants to unauthorized staff.

31. During her/their tenure, the Plaintiff's disparate treatment was also reflected on the MPS website. Instead of her/their contact information being accessible in the same manner as the other White directors and administrators, the Plaintiff was segregated

to only the MPS high school page and was not readily accessible, as it requires a search before gaining access to it.

32. The Plaintiff was also the only director on the leadership staff with minimal supports, resources and/or staff. Other White colleagues in MPS leadership roles were provided with more staff and support than the Plaintiff. For example, the director of special education each has staff in each school within the district, while the principal and assistant principal also have their own staff and assistants. All of these individuals are White. Without the proper support, the METCO program could not operate effectively. The Plaintiff was responsible for approximately fifty-six (56) METCO students located at four different schools within the district.

33. Additionally, other METCO districts have support staff for METCO Directors or have a program that is fully integrated where the teachers and schools provide support. Defendant MPS, however, did not follow this approach.

34. Defendants MPS, Buckey and Murphy intentionally engaged in efforts to reduce support for the Plaintiff. For example, despite opposition from the Plaintiff, the Defendants modified the job description of the Plaintiff's assistant, Delta Thomas, the METCO paraprofessional/administrative aide, and this resulted in dramatically less support for the Plaintiff and left her/them supporting the four school METCO programs essentially alone.

35. The Defendants also refused to hire additional staff to help the Plaintiff manage the METCO program at four schools, and canceled meetings the Plaintiff had set up to address fulfilling these METCO needs. In addition, the Plaintiff sought to utilize another staff member, who was paid by the METCO grant (Patrice Clough) to support her/their efforts, but this was rejected by the Defendants. The Plaintiff sought to assign Ms. Clough to the direct tutoring program as well as to conduct the check ins for the MPS high school METCO students. Ms. Clough had been assigned to other initiatives that did not predominantly benefit the MPS METCO students, and the Plaintiff had complained about this to the Defendants without any results or remedy.

36. When the Plaintiff assigned Ms. Clough to oversee the METCO students and to be proactive in tracking their educational growth so no student slipped through the cracks, Ms. Clough was advised by the Defendants that this assignment had not been approved and that the Defendants would need to meet before issuing their approval for this assignment. However, this meeting never materialized, despite the Plaintiff's expressed concerns communicated via email with the Defendants on or about August 31, 2020. When the Plaintiff then sought supervision assistance from other Defendant MPS employees for the benefit of METCO students, no assistance was provided. Even emails requesting this assistance, on or about August 27, 2020 and September 9, 2020 went unanswered.

37. Consequently, the Plaintiff was required to work over twelve hours a day every day to keep on top of her/their wide-ranging responsibilities, which even included traveling from Marblehead to Boston to provide home deliveries directly to METCO students. Indeed, the Plaintiff was expected to make these personal deliveries herself/themselves even after she had organized a "Welcome Back Night" event for the METCO families to meet with the Defendants and other school leaders as well as to pick up their student's school materials. Moreover, even where one family had volunteered to pick up their student's materials, the Defendants rejected the idea and insisted that the Plaintiff conduct the delivery herself/themself. There was often not even time for the Plaintiff to take for lunch or breaks.

38. Additionally, the Defendants' own mishandling of the METCO program often required the Plaintiff to work extra hours. For example, on one occasion, the Defendants failed to timely communicate with METCO students that certain events or sports were canceled, resulting in a METCO student being left stranded unnecessarily in Marblehead. The Plaintiff then assisted that student with transportation home.

39. Defendants also improperly diverted METCO resources away from METCO students. METCO tutors, for example, were not permitted to provide services only for METCO students, but were extended to non-METCO students, thereby limiting their availability for METCO students. Other resources were not easily accessible or available for METCO students. The Plaintiff repeatedly protested these practices but her opposition was repeatedly silenced, ignored and/or retaliated against.

40. The Defendants also prohibited the Plaintiff from overseeing these tutors, although they were part of the METCO program and paid with METCO grant funds.

41. The Plaintiff also sought support from the Defendants regarding several financial issues associated with the METCO grant, including from John Moretti, the previous Assistant Superintendent and Defendant Murphy. The Plaintiff, however, was not assisted with these inquiries and in fact, was told by a union representative, Ms. Robin Feins, that if she said anything about those issues, she would be "blackballed and never work for a district again."

42. The Plaintiff was also not properly credited for work she/they completed. Defendants Buckey and Murphy as well as Lynsey Page would often take credit for work accomplished by the Plaintiff. Defendant Buckey, for example, would create weekly superintendent newsletters and oftentimes, he failed to credit the Plaintiff for the work she/they did while frequently praising the contributions of her/their White and non-disabled colleagues.

43. For example, on or about September 18, 2020, Defendant Buckey published an article on Patch.com about Defendant MPS' purported anti-racism efforts and referred to the METCO program, but failed to acknowledge the Plaintiff and her/their significant efforts in spearheading that initiative.

44. The Defendants also engaged in efforts directly contrary to its purported mission of fostering diversity as Defendants instructed the Plaintiff to remain silent about racist incidents that occurred within the Defendant MPS district.

45. For example, on or about September 16, 2020, the Plaintiff became aware of a recent incident where a number of White MPS students "Zoom bombed" METCO students calling them abhorrent racial slurs, including the "N-word." The Plaintiff then informed Defendant Buckey about this incident and her opposition to this conduct, but he instructed the Plaintiff not to inform the student families and to remain silent on this matter.

46. In other incidents, during September 2020, white supremacist groups located in the Town of Marblehead harassed multiple MPS students. The Defendants not only sought to minimize these incidents, but also failed to substantively address them and properly protect the METCO student victims. On or around the week of September 16, 2020, there were several instances in meetings between the Plaintiff and the Defendants when these incidents were discussed. On at least two occasions, blatant acts of white supremacy perpetrated by MPS students was addressed. On another occasion, the Plaintiff reported to the Defendants an incident in which a Black non-Metco student was racially harmed by a White MPS student.

47. Defendant Buckey again instructed the Plaintiff to remain silent about these incidents and told the Plaintiff that they needed to "get around this."

48. Defendant Buckey also required the Plaintiff to misrepresent the status of racial relations in the Town of the Marblehead and write a statement stating that "We're all METCO." Although the Plaintiff did not agree with this representation, she felt pressured to comply for fear of losing her job and livelihood.

49. The Defendants also improperly placed negative information into the Plaintiff's personnel file without her/their notice or knowledge, and also failed to provide her/them with an opportunity for her/them to rebut them, as Massachusetts law requires.

50. Additionally, when the Plaintiff complained about this disparate treatment and unlawful practices from Defendant MPS Human Resources personnel, such as to Salina Ponticelli and Michelle Cresta, and sought support, her/their efforts were rebuffed and futile as her complaints were largely directed against the two highest ranking administration officials in the Defendant MPS' administration, Defendants Buckey and Murphy. Indeed, on September 11 2020, when the Plaintiff reached out to Ms. Ponticelli, she directed her/them to Ms. Cresta who told her/them that most things were handled by the superintendent.

51. The Defendants' disparate treatment even permeated their treatment of the Plaintiff's disability. When the Plaintiff expressed concern about her/their medical

disability and requested accommodations on or about August 17, 2020, including but not limited to the opportunity to continue to work from home because of her/their disability and the risk COVID-19 posed to her/their health. She/They inquired about the paperwork that was required and Defendant Buckey provided a vague response. In turn, the Plaintiff provided him with paperwork from her/their doctor. Defendant Buckey then said that such paperwork was not sufficient. The Plaintiff subsequently provided further paperwork from her/their doctor and a meeting was scheduled on August 27, 2020 to discuss her situation. However, Defendant Buckey did not appear for the meeting on that date. The meeting was instead held on August 28, 2020 and Defendant Buckey told the Plaintiff that she/they would be permitted to work from home remotely and if an emergency arose, she/they would then be required to attend work in-person.

52. In fact, on August 28, 2020, the Plaintiff confirmed this agreement and accommodation in writing, sending an email to Defendant Buckey as follows:

> On Fri, Aug 28, 2020 at 12:28 PM Jasmine Boyd Perry
> <boydperry.jasmine@marbleheadschools.org> wrote:
> Hi John,
>
> I am glad we were able to find time to speak this morning. I am writing to confirm what we discussed and next steps.
>
> We agreed that accommodations would for me that include working from home part time and coming into the district as needed and in accordance with my physicians recommendations. I will continue to grow the program as well as communicate with families, staff and Metco HQ personnel. I will work directly with my metco staff including Delta Thomas (Metco Para/Bus Monitor), Glni Bowen (Metco Tutor) and Patrice Clough (Metco RTI Tutor) to ensure student support, maintain efficiency and address any concerns.
>
> We also discussed the work I did outside of my contract during the summer to ensure Metco families needs were met. This work included participating in Marblehead committees, communicating with PCOs, leadership and students, managing enrollment, addressing the needs of families concerning transportation, good, social emotional wellness, academic support and more.
>
> Lastly we confirmed I will continue to report to the Assistant Superintendent Nan and work closely with my Metco Para/Bus monitor Delta Thomas and tutors to ensure a successful year.
>
> Next steps include sending you additional paperwork regarding my medical needs, continuing to manage the logistics of the Metco program and finalizing the academic models selected by families we have not heard back from.
>
>
> Best,
>
> **Ms. Jasmine Boyd-Perry**
> METCO Director
> Pronouns: She/Her & They/Them

9

2 Humphrey Street, Marblehead MA, 01945
MOBILE: 781.576.9556
OFFICE: 781.639.3100 ext. 2162
FAX: 781.639.3105

53. In response to that email, Defendant Buckey emailed the Plaintiff his agreement and
stated the following:

> On Fri, Aug 28, 2020 at 1:10 PM John Buckey
> <buckey.john@marbleheadschools.org> wrote:
> Jasmine
>
> It was good to "meet" today.  Per our meeting, I will put in writing the **remote
> working hybrid plan** we discussed as you work to provide the additional
> documentation.  I hope you have a great weekend.
>
> John

(emphasis added).

54. On or about August 31, 2020, the Plaintiff sent a follow-up email to Defendant
Buckey to provide him with an updated medical certification from her/their
physician that her/their self-isolation was required to avoid circumstances that may
exacerbate her/their health conditions.

55. That physician also indicated that the Plaintiff's "chronic medical conditions"
require her/their to "work from home as she may not be safe in an environment
where fresh air is not available." Additionally, the provider indicated that the
Plaintiff "has great difficulty wearing masks as they result in chest tightness,
inability to take a full breath, and dizziness as well as increased use of her/their
rescue medication and the need for frequent mask breaks."

56. Indeed, the Plaintiff's work environment was fraught with grave risk as employees
initially were not required to under COVID testing before returning to the office and
often, employees in the office did not properly wear their masks and there was very
poor air quality and air circulation.  Very few windows were open in the Plaintiff's
work location and while a private office had been provided as a suggestion, the
Plaintiff was still required to walk through public hallways with very poor
ventilation. The Plaintiff's physician subsequently recommended that the Plaintiff
work remotely because of the grave danger COVID-19 posed to her/their health.
The Plaintiff's physician learned that testing was not required for employees to
return to the office and also learned that employees did not wear their masks
properly.  Defendant Murphy, for example, would not always wear her mask.
Additionally, the office location that was assigned to the Plaintiff required her/their
to walk through public hallways with poor ventilation and to be in a room where the
windows barely open and there were water stains on the ceilings.

57. Despite this medical certification and the Defendants' agreement, the Defendants
failed to provide the Plaintiff with the agreed upon reasonable accommodation.

Instead, the Defendants required the Plaintiff to be present in person onsite at MPS locations consistently during the school day. Notably, in their Position Statement, filed with the Massachusetts Commission Against Discrimination ("MCAD") in response to the Plaintiff's MCAD Complaint, the Defendants admit to receiving this information from the Plaintiff about her medical conditions during August 2020 and her requests for a reasonable accommodation. Indeed, the Defendants admit learning of the Plaintiff's "undisclosed health condition" as early as March 2020.

58. During September 2020, the Plaintiff experienced a panic attack, mistreatment and micromanagement from the Defendants. Her/Their efforts to schedule meetings and address issues necessary to support METCO families were cancelled and the environment she worked in grew increasingly racist and hostile.

59. When the Plaintiff's health deteriorated further as a result of the Defendant MPS' failure to accommodate the Plaintiff's request for a reasonable accommodation, the Plaintiff's condition required a medical leave of absence on or about September 23, 2020 through September 28, 2020.  During this time, the Plaintiff was also awaiting the results of her/their COVID test.

60. Meanwhile, a reasonable accommodation request made by a male and White colleague around the same time as the Plaintiff's and it was granted by the Defendants, allowing him to work remotely from home full-time.

61. The Plaintiff was also told by Defendants Buckey and Murphy that she was not performing her/their job properly, that she would be unable to do her/their job working from home and that she could not work remotely from home.  The Plaintiff and Defendant Buckey had a conversation on or about October 5, 2020 when he expressed that if the Plaintiff did not come and accept the accommodation offered by him that the only other thing he would provide her/them was unpaid medical leave effective immediately until fall of 2021. He wanted the Plaintiff to decide to come in or go on unpaid leave and decide within only a few days. The Plaintiff attempted to discuss and explore other alternatives with Defendant Buckey, but he rejected such efforts and failed to engage in a meaningful and interactive dialogue.

62. The Defendants provided the Plaintiff with correspondence on or about October 5, 2020 denying the Plaintiff's reasonable accommodation request and thereafter, rejected any other effort by the Plaintiff to discuss her/their request. Defendant Buckey reiterated once more that if the Plaintiff did not accept the accommodation he was offering, then the Plaintiff's only alternative was to take an unpaid medical leave effective immediately until the fall of 2021. He insisted that she make this decision within a few days and refused to consider her/their other suggestions of working in a nearby building that was empty.

63. The Defendants made these assertions despite evidence that the Plaintiff was able to work remotely from home effectively during the end of the Spring 2020 term and throughout the entire summer of 2020.

64. Due to the failure of the Defendants to engage in a meaningful, interactive dialogue and provide her with a reasonable accommodation, the Plaintiff was required to risk her/their health and well-being by performing her/their responsibilities on site at MPS.

65. During this time, from approximately 7:20 a.m. to 12:30 p.m., the Plaintiff was given no choice but to work from her/their car because she could not safely go into Defendant MPS' office. These hours could vary, however, depending upon whether there was a delay relating to the buses or families.

66. She was also required to go over to another district to be able to safely use the restroom.

67. The Plaintiff experienced another such panic attack and also fainted, resulting in a hospital visits on or about October 8, 2020 and October 9, 2020. To improve her/their health, the Plaintiff's physician ordered the Plaintiff to remain out of work from approximately October 8, 2020 to October 9, 2020, and then again from approximately October 13, 2020 through November 3, 2020. When the Plaintiff communicated these medical setbacks to the Defendants via email, the Defendants again failed to meaningfully engage in the requisite interactive dialogue regarding her medical condition nor her reasonable accommodation requests. Notably, the Defendants purportedly sent her two written communications on or about October 16, 2020 and October 19, 2020 and in each of these communications, they failed to engage in any meaningful and interactive dialogue with the Plaintiff. Callously and maliciously, the Defendants in their communications also failed to even inquire as to the status of her/their well-being or to even wish her/them a speedy recovery. Instead, the Defendants communications were harsh, critical of her and demeaning to the Plaintiff.

68. The Plaintiff was then approved for a medical leave under the Family Medical Leave Act ("FMLA") beginning November 17, 2020. The Defendants then improperly and retroactively assigned her/them prior leave from approximately October 13, 2020 through November 3, 2020 as FMLA leave. The Plaintiff, however, was not seeking FMLA leave earlier than November 17, 2020 and Defendants' actions resulted in her/their loss of valuable FMLA time she/they was/were entitled to.

69. At no point, however, did the Defendants provide the Plaintiff with the requisite information from the Defendants about her/their rights under the FMLA or the availability of pandemic unemployment benefits.

70. In fact, she/they only received the FMLA paperwork via email which simply stated that it was approved and no other information was provided. The Defendants failed to explain what options were available to her/them or the process.

71. During this time, consequently, the Plaintiff exhausted all of her/their sick leave benefits and went weeks without any income unnecessarily.

72. Additionally, on various occasions, the Defendants improperly deducted sick time from the Plaintiff. Indeed, the Plaintiff was required to use sick time for days that she/they worked remotely.

73. On or about January 3, 2021, the Plaintiff contacted Defendant Buckey via email and informed him that she/they had not yet been cleared to safely return to work by her/their medical provider and therefore requested additional time for her/their leave.

74. In response, the Defendants did not meaningfully engage with Plaintiff about this development, her/their current medical status, nor engage in a further interactive dialogue about the Plaintiff's reasonable accommodation request. The Defendants instead, as they admit in their MCAD Position Statement, did not provide the Plaintiff with any further accommodation. Indeed, when they responded to the Plaintiff's January 3, 2021 email, they did not advise the Plaintiff that they would engage in a further dialogue or that further medical documentation was being requested; instead, in callous disregard for her request and for her health, they demanded that she/they return to work on January 4, 2021.

75. Due to a medical setback, the Plaintiff was unable to check her/their work or personal email to receive this January 3, 2021 correspondence from the Defendants until Thursday, January 7, 2021, and only then did she/they check her/their personal email account to discover not only the January 3, 2021 email, but also a January 7, 2021 email from Defendant Buckey which informed the Plaintiff that her/their MPS employment was terminated, effective January 7, 2021.

76. Before terminating the Plaintiff, the Defendants made no meaningful effort to discuss her/their medical status and her/their medical leave with the Plaintiff. Indeed, at no point during this entire time, including during the week of January 4, 2021, had the Plaintiff received from the Defendants any telephone communication, whether on her/their personal cell phone or her/their work cell phone, seeking to discuss this matter with her/their or informing her/their of these developments and/or requesting additional information from her/them. It was the very antithesis of an interactive, meaningful dialogue.

77. While the Defendants claimed that the Plaintiff had "abandoned" her/their position, and used that purported reason to justify her/their termination, that contention was false and unsubstantiated.

78. The Plaintiff did not "abandon" her/their position and in fact, had every intention of returning to her/their MPS work following her/their medical leave and returning to her/their students. The Plaintiff had not yet received clearance from her/their medical provider, which she/they had not yet received by January 3, 2021. In fact,

13

she/they was unable to get a medical appointment scheduled prior to January 12, 2021 with her/their physician to address her/their clearance and ability to return to work following her/their FMLA leave.

79. The Plaintiff was looking forward to seeing her/their students again and to sharing the holiday cards she/they had prepared for them. *See* Exhibit A, Photograph of Holiday Cards for MPS students.

80. Even when the Plaintiff's legal representative contacted Defendant Buckey on or about January 7, 2021 to inform him of these developments and reiterate the Plaintiff's position that she/they had not abandoned her/their job, the Defendants did not seek to remedy her/their termination or even engage in any meaningful dialogue with the Plaintiff about her/their medical status and accommodation request. Notably, the Defendants in their MCAD Position Statement make no mention of this communication from the Plaintiff's legal counsel.

81. Indeed, Defendants made no efforts to correct her/their wrongful termination or to engage in any interactive dialogue. The Defendants also failed to offer or discuss with the Plaintiff her/their accommodation options.

82. In addition to Defendants' racially discriminatory actions, Defendants' repeated failure to meaningfully engage in a meaningful dialogue about the Plaintiff's disability and accommodations, their failure to provide the Plaintiff with a reasonable accommodation during her/their employment, and their termination of her/their employment while she/they was on medical leave resulted in a violation of Massachusetts General Laws, Chapter 151B, Title VII and the federal Americans with Disabilities Act. Under those governing statutes, it is illegal for an employer to discriminate against someone based on a disability or handicap.

83. The MCAD has issued guidelines regarding reasonable accommodations and they are particularly instructive with respect to Plaintiff. Such guidelines define "reasonable accommodation" as "any adjustment or modification to a job (or the way a job is done), employment practice, or work environment that makes it possible for a handicapped individual to perform the essential functions of the position involved and to enjoy equal terms, conditions and benefits of employment."

84. The Plaintiff's request to work remotely and her/their request to receive medical clearance from her/their physician before returning to work certainly falls within that definition.

85. Moreover, a Massachusetts court has already determined that an employee diagnosed with just one of the Plaintiff's medical conditions - asthma - was determined to be disabled during the pandemic. *See* Exhibit A, *Peeples v. Clinical Support Options, Inc.*, No. 3:20-cv-30144-KAR, at *6 (D. Mass. Sep. 16, 2020) decision.

86. In *Peeples v. Clinical Support Options, Inc.,* No. 3:20-cv-30144-KAR, at *6 (D. Mass. Sep. 16, 2020), the court explained the following:

> As to the first element, Plaintiff is likely to prevail on their contention that their asthma is a disability, at least during the COVID-19 pandemic. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

87. In that court's view, and in part because of the COVID-19 pandemic the employee's asthma qualified as a disability under the American with Disabilities Act ("ADA").

88. Indeed, in *Peeples*, the court recognized that the fact that an employee is at higher risk for serious illness or even death if they contract COVID-19 because of their asthmatic condition should be considered by the court in rendering its determination. *See id.*; *see also Silver v. City of Alexandria*, CASE NO. 1:20-CV-00698, 2020 WL 3639696, at *4 (W.D. La. July 6, 2020) (during the COVID-19 pandemic, whether a plaintiff has a disability should be judged by the totality of the circumstances, including the heightened risks of an impairment caused by the pandemic); *Valentine v. Collier,* Civil Action No. 4:20-CV-1115, 2020 WL 3625730, at *2 (S.D. Tex. July 2, 2020) (plaintiffs successfully pled a failure to accommodate claim where they identified disabilities that subjected them to a heightened risk of death or serious illness if they contracted COVID-19).

89. Beyond that, the MCAD Guidelines also provide that "[t]he duty to provide reasonable accommodations applies to all aspects of employment, and is intended to reduce work-related barriers that are related to an individual's handicap. Reasonable accommodations apply to workplace modifications that specifically assist an individual in performing the duties of a particular job . . . ."

90. Included among the types of reasonable accommodations available to employees and specifically delineated by the MCAD Guidelines are modifications to an employee's work schedule and "modifying when and how an essential job function is performed . . . ."

91. The Guidelines also provide that an employer must provide a reasonable accommodation to an employee whose handicap and need for such accommodation is known or should be known.

92. Here, it cannot be disputed that disability was not known to the Defendants.

93. As set forth above, no substantive or interactive dialogue consistently occurred between the Plaintiff during her/their employment, her/their medical leave or after her/their termination regarding her/their reasonable accommodation requests.

94. The Guidelines provide that "[i]f a person with a handicap requests but cannot suggest an appropriate accommodation, the employer and the individual should work together to identify one." *See* MCAD Handicap Guidelines at 15-16.

95. Here, not only did Plaintiff provide requests for reasonable accommodations and was denied, but there was also no further discussion or any interactive process that followed to determine an appropriate accommodation that would properly assist her/them at various points.

96. Under the governing statutes, the duty to provide a reasonable accommodation requires an employer to participate in an interactive process with a disabled employee who requests an accommodation. *See* MCAD Handicap Guidelines at 15-16, 20 MDLR Appendix (1998); *Mammone v. President & Fellows of Harvard College*, 446 Mass. 657, 670 n.25 (2006); *Shedlock v. Department of Correction*, 442 Mass. 844, 856 n. 8 (2004); *Ocean Spray Cranberries, Inc. v. MCAD*, 441 Mass. 632, 644 (2004).

97. The interactive process requires the employer to engage in a direct, open, and meaningful communication with the employee. It is designed to identify the precise limitations associated with the employee's disability and the potential adjustments to the work environment that could overcome the employee's limitations. *See MBTA v. MCAD*, 450 Mass 327, 342 (2008); *Mazeikus v. Northwest Airlines*, 22 MDLR 63, 68-69 (2000); *Daly v Codman & Shurtleff, Inc.*, 35 MDLR 85 (2013).

98. On repeated occasions, the Defendants failed to provide the Plaintiff with a substantive, meaningful and/or interactive communication about her reasonable accommodation request prior to her wrongful termination.

99. The Plaintiff, however, was not given the opportunity to participate in an interactive process designed to fashion a reasonable accommodation during various points of her employment with Defendant MPS.

100. Defendant MPS' approach to the reasonable accommodation process was essentially non-existent and devoid of any meaningful interactive communication.

101. Defendant MPS' unyielding approach to the interactive process violates the fundamental tenet that a flexible dialogue unfold to achieve a mutually beneficial goal. *See Johansson, supra* (recognizing duty to cooperatively explore issue of reasonable accommodation with disabled employee in order to determine if accommodation is feasible).

102. Here, the Defendants were aware that Plaintiff's medical condition necessitated modifications to her/their work schedule, but repeatedly declined to enter into any meaningful and flexible dialogue to explore ways in which the Plaintiff could be accommodated during both her/their employment and even after her/their wrongful

termination.

## **STAFF ACTION ALSO CONTRIBUTED TO THE RACIALLY HOSTILE WORK ENVIRONMENT**

103. In addition to this disparate treatment from Defendant MPS' administration, the Plaintiff was also subjected to disparate treatment inflicted by members of the MPS staff. Indeed, given this hostile environment it is not surprising that at least two other discrimination complaints have been filed against MPS and Defendant Buckey, including a complaint filed by Brian Ota alleging that the Defendants engaged in racially discriminatory conduct by failing to renew his principal contract.

104. For example, she/they was often muted and/or ignored during the Defendants' Zoom meetings when she/they voiced concerns about METCO students being left out of MPS district wide initiatives and considerations, i.e. sports and transportation. For example, on or about September 18, 2020, during a meeting involving fall sports, the Plaintiff was muted online and then pressured by the Defendants to encourage students to return to the district despite her/their concerns regarding COVID safety protocols with transportation. On other occasions, the Plaintiff was excluded from meetings by the Defendants as they failed to provide her/them with the requisite meeting information and Zoom links.

105. Also, on or about October 4, 2020, there was a meeting held by Dan Bauer, MPS High School principal, when the Plaintiff had asked him to ask the teachers if they were able to provide supervision and support for METCO students during meals (breakfast and lunch). Specifically, the Plaintiff asked if anyone would share a meal with a METCO student, and in response, he blatantly ignored the Plaintiff's request, ended the meeting and falsely represented that there were no more questions.

106. The Plaintiff has also had her/their ideas/suggestions ignored only to have them usurped and presented by a White colleague whose idea is then welcomed and/or adopted.

107. For example, during October 2019, the Plaintiff suggested that Defendant MPS implement a book club and/or recommend a reading list that focuses on tackling racism and inequality in the Town of Marblehead. This recommendation included books, articles, videos Defendant on this topic. This suggestion was rejected by the Defendants and the Plaintiff was told that it would be difficult to implement.

108. However, when this same idea was suggested by a White colleague, Vice Principal Lyndsay Page, when the school year was ending on or about May/June 2020 and when the Black Lives Matter movement gained increased prominence, it was readily accepted by the Defendants and implemented. The Plaintiff then was tasked with organizing an implicit bias training despite Ms. Page's efforts to sabotage the Plaintiff's efforts.

109. Defendant MPS staff also asked the Plaintiff to handle situations with other students of color because these students were discriminatorily assumed to be METCO students because they were Black.

110. For example, when the Plaintiff would sit in on the teacher meetings and when Marblehead students of color would come up in the discussion, Defendant MPS staff would improperly assume the student was a METCO student and ask the Plaintiff if she/they had any updates or information on that student.

111. The Plaintiff, because of her/their race, was also assumed to be the parent of multiple METCO students even while wearing her/their administrator badge by numerous Defendant MPS staff members.

112. As discussed above, Defendant MPS staff also failed to treat the METCO students equally as non-METCO students.

113. Additionally, Defendant MPS teachers and staff would contact the Plaintiff to address issues relating to a METCO student instead of contacting the METCO student's families directly, as was the case with non-METCO and White students.

114. Defendant MPS staff have also perpetrated falsehoods about the Plaintiff. For example, the principal of the Glover School lied about the Plaintiff in an email regarding student absences.

115. Additionally, during the Plaintiff's tenure, the Defendant MPS Director of Special Education falsely represented that the Plaintiff was responsible for onboarding students with Individualized Educational Plans ("IEPs") because that has always been the responsibilities of METCO directors.

## COUNT ONE

## G.L. 151B/Title VII - HOSTILE WORK ENVIRONMENT

## **Plaintiff v. Defendant MPS**

116. The Plaintiff refers to the allegations of Paragraphs 1 through 115, and by such reference repleads and incorporates them as though fully set forth here.

117. The conduct of Defendant MPS, as set forth above, created a racially hostile work environment in violation of G.L. 151B/Title VII.

118. Said conduct of Defendant MPS constitutes a violation of public policy.

119. As a proximate result of Defendant MPS' conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience retirement benefits, and other employee benefits that she/they would have received absent Defendant MPS's discrimination. Furthermore, the Plaintiff

has incurred additional costs and expenses due to MPS' discrimination.

120  As a further proximate result of the above-mentioned acts, the Plaintiff
has suffered humiliation, mental pain and anguish, all to the Plaintiff's
damage.

121. The above-mentioned acts of Defendant MPS were willful, wanton,
malicious, and oppressive, and justify the awarding of exemplary
and punitive damages.

## COUNT TWO

### G.L. 151B/Title VII - RACIAL/ETHNIC/NATIONAL ORIGIN DISCRIMINATION

### Plaintiff v. Defendant MPS

122.  The Plaintiff refers to the allegations of Paragraphs 1 through 121, and
by such reference repleads and incorporates them as though fully set forth here.

123.  The conduct of Defendant MPS, as set forth above, constitutes unlawful
discrimination against the Plaintiff on the basis of race and/or ethnic/national
origin, in violation of G.L.  151B/Title VII.

124.  Said conduct of Defendant MPS constitutes a violation of public policy.

125.  As a proximate result of Defendant MPS' conduct, the Plaintiff has
suffered and continues to suffer substantial losses in earning, job experience,
retirement benefits, and other employee benefits that she/they would have
received absent Defendant MPS's discrimination. Furthermore, the Plaintiff
has incurred additional costs and expenses due to MPS's discrimination.

126.  As a further proximate result of the above-mentioned acts, the Plaintiff has
suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

127.  The above-mentioned acts of Defendant MPS were willful, wanton,
malicious, and oppressive, and justify the awarding of exemplary and
punitive damages.

## COUNT THREE

### G.L. 151B/Title VII - RETALIATION

### Plaintiff v. All Defendants

128.  The Plaintiff refers to the allegations of Paragraphs 1 through 127, and by
such reference repleads and incorporates them as though fully set forth here.

129. The conduct of Defendant MPS, as set forth above, constituted unlawful retaliation in violation of G.L. ch. 151B and/or Title VII.

130. As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## COUNT FOUR

### G.L. 151B/Title VII - AIDING AND ABETTING DISCRIMINATORY ACTS & UNLAWFUL INTERFERENCE

### Plaintiff v. Defendants Buckey and Murphy

131. The Plaintiff refers to the allegations of Paragraphs 1 through 130, and by such reference repleads and incorporates them as though fully set forth here.

132. Defendants Buckey and Murphy as agents of Defendant MPS, discriminated against the Plaintiff and aided and abetted Defendant MPS in discriminating against the Plaintiff on account of her/their race and/or ethnic/national origin in violation of G.L. ch. 151B and Title VII and/or committed unlawful interference with such rights.

133. As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## COUNT FIVE

### G.L. 151B/ADA  - HANDICAP DISCRIMINATION

### Plaintiff v. Defendant MPS

134. The Plaintiff refers to the allegations of Paragraphs 1 through 133, and by such reference, repleads and incorporates them as though fully set forth here.

135. The conduct of Defendant, as set forth above, constitutes unlawful discrimination against the Plaintiff on the basis of her/their disability, the  failure to engage in an interactive dialogue, and failure to provide a reasonable accommodation, in violation of G.L. 151B and the ADA.

136. Said conduct of Defendant constitutes a violation of public policy.

137. As a proximate result of Defendant's conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that she/they would have received absent Defendant's discrimination.  Furthermore, the Plaintiff has incurred additional costs and expenses due to Defendant's discrimination.

138. As a further proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

139. The above-mentioned acts of Defendant were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT SIX

### G.L. 151B - AIDING AND ABETTING AND UNLAWFUL INTERFERENCE - DISCRIMINATORY ACTS

#### Plaintiff v. Defendants Buckey and Murphy

140. The Plaintiff refers to the allegations of Paragraphs 1 through 139, and by such reference repleads and incorporates them as though fully set forth here.

141. Defendants Buckey and Murphy as agents of Defendant MPS, discriminated against the Plaintiff and aided and abetted Defendant MPS in discriminating against the Plaintiff on account of her/their handicap in violation of G.L. ch. 151B and TitleVII and/or committed unlawful interference.

142. As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## COUNT SEVEN

### WILLFUL VIOLATION OF THE FAMILY MEDICAL LEAVE ACT (FMLA)

#### Plaintiff v. Defendants MPS, Buckey and Murphy

143. The Plaintiff refers to the allegations of Paragraphs 1 through 142, and by such reference repleads and incorporates them as though fully set forth here. The conduct of Defendants, as set forth above constitutes a violation of the Family Medical Leave Act("FMLA").

144. Said conduct of Defendants constitutes a violation of public policy.

145. As a proximate result of Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that she/they would have received absent Defendants' violation.

146. As a further proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the

Plaintiff's damage.

147.  The above-mentioned acts of Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT EIGHT

## WILLFUL VIOLATION OF THE FAMILY MEDICAL LEAVE ACT (FMLA) - RETALIATION

### Plaintiff v. Defendants MPS, Buckey and Murphy

148.  The Plaintiff refers to the allegations of Paragraphs 1 through 147, and by such reference repleads and incorporates them as though fully set forth here.

149.  The conduct of Defendants, as set forth above and including but not limited to the unjustified termination of the Plaintiff while she/they was on leave, constitutes a violation of the Family Medical Leave Act (FMLA).

150.  Said conduct of Defendants constitutes a violation of public policy.

151.  As a proximate result of Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that she/they would have received absent Defendants' violation.

152.  As a further proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

153.  The above-mentioned acts of Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT NINE

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### Plaintiff v. Defendants  MPS, Buckey and Murphy

154.  The Plaintiff refers to the allegations of Paragraphs 1 through 153 and by such reference repleads and incorporates them as though fully set forth here.

22

155.  The conduct of Defendants, as set forth above, resulted in the wrongful termination of the Plaintiff following her opposition to unlawful practices by the Defendants, as set forth above.

156.  As a proximate result of Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that she would have received absent Defendant's retaliation. Furthermore, the Plaintiff has incurred additional costs and expenses due to the Defendant's retaliatory and unlawful action

## COUNT TEN

## INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS/CONTRACTUAL RELATIONS

### Plaintiff v. Defendants  Buckey and Murphy

157.  The Plaintiff refers to the allegations of Paragraphs 1 through 156, and by such reference repleads and incorporates them as though fully set forth here.

158.  At all times relevant, Defendants Buckey and Murphy were employed by Defendant MPS and served as agents of Defendant MPS.

159.  Defendants Buckey and Murphy, as agents of Defendant MPS, intentionally interfered with the Plaintiff's employment by retaliating against her following her report of unsafe and unlawful patient care.

160.  As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## COUNT ELEVEN

## VIOLATION OF THE MASSACHUSETTS WHISTLEBLOWER ACT – G.L. c. 149, §185

### Plaintiff v. All Defendants

161.  The Plaintiff refers to the allegations of Paragraphs 1 through 160 and by such reference repleads and incorporates them as though fully set forth here.

162.  In taking the above described actions, the Defendants violated G.L. c. 149, §185 which provides protection against retaliatory action for any public employee who, like the Plaintiff, opposes to her supervisor a practice or

practices which she reasonably believed were illegal and/or posed a threat to public health and safety.

163.   As a result of this illegal conduct, the Plaintiff has suffered and will continue to suffer damages to her professional life and future career opportunities, past and future lost wages, emotional distress and non-pecuniary damages.

## COUNT TWELVE

### VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT–
### G.L. c. G.L. c. 12, §11H

### Plaintiff v. Defendants Buckey and Murphy

164.   The Plaintiff refers to the allegations of Paragraphs 1 through 163 and by such reference repleads and incorporates them as though fully set forth here.

165.   In taking the above described actions, the Defendants violated G.L. c. 12, §11H, the Massachusetts Civil Rights Act, with threats, intimidation, and coercion.

166.   As a result of this conduct, the Plaintiff has suffered and will continue to suffer damages to her professional life and future career opportunities, past and future lost wages, emotional distress and non-pecuniary damages.

WHEREFORE, Plaintiff demands against the Defendants as follows:

1.   That actual damages be awarded to the Plaintiff;

2.   That compensatory damages be awarded to the Plaintiff;

3.   That punitive damages be assessed against the Defendants;

4.   That the Plaintiff be awarded the costs of this action;

5.   Reasonable attorney's fees; and

6.   Such other and further relief as the court may deem necessary and proper.

Respectfully submitted,
Plaintiff,
JASMINE BOYD-PERRY,
By her attorney,


 /s/ Helen G. Litsas


_____
Helen G. Litsas
BBO#644848
**LAW OFFICE OF HELEN G. LITSAS**
22 Mill Street, Suite 408
Arlington, MA 02476
(781) 646-1518 (telephone)
(781) 643-1126 (facsimile)
(617) 596-5561 (cell)

# EXHIBIT A

# PEEPLES v. CLINICAL SUPPORT OPTIONS, INC.

Case No. 3:20-cv-30144-KAR.

GABRIEL PEEPLES, Plaintiff, v. CLINICAL SUPPORT OPTIONS, INC., Defendant.

United States District Court, D. Massachusetts.

September 16, 2020.

---

## MEMORANDUM AND ORDER REGARDING PLAINTIFF'S FIRST MOTION FOR A TEMPORARY RESTRAINING ORDER

## (Docket No. 2)

**KATHERINE A. ROBERTSON**, *Magistrate Judge.*

## I. INTRODUCTION

This matter is before the court on plaintiff Gabriel Peeples' ("Plaintiff," "they," "them," "their") motion for a preliminary injunction under Fed. R. Civ. P. 65(a) and (b) to preclude the termination of their employment by defendant Clinical Support Options, Inc. ("Defendant" or "CSO") (Dkt. No. 2). Plaintiff, who suffers from moderate asthma, alleges that notwithstanding their increased vulnerability to the novel coronavirus, Defendant has refused to permit them to continue to telework in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.* (Count I) and Mass. Gen. Laws ch. 151B, § 16(4) ("Chapter 151B") (Count II).[1] The parties have consented to this court's jurisdiction (Dkt. No. 12). *See* 28 U.S.C. §636(c); Fed. R. Civ. P. 73. After hearing from the parties via videoconference on September 11, 2020, Plaintiff's motion for preliminary injunctive relief is GRANTED for the reasons and on the terms that follow.

## II. BACKGROUND FACTS[2]

Plaintiff began working as an assistant manager for CSO's Center for Community Resilience after Trauma ("CCRT") program at One Arch Place in Greenfield, Massachusetts on March 2, 2020. On March 10, 2020, Massachusetts Governor Charles Baker declared a state of emergency based on the coronavirus outbreak. The Centers for Disease Control and Prevention ("CDC") acknowledged that people with underlying conditions, such as asthma, were at a greater risk of serious illness if they contracted COVID-19. Because of Plaintiff's asthma, their doctors advised them to telework in order to avoid exposure to the virus. On March 18, 2020, Plaintiff advised their direct supervisor, Kelly Boardway, that they needed to telework to protect their health.

Plaintiff performed all the essential duties of their position along with other job-related tasks while teleworking.

On May 14, 2020, Sandi Walters, Boardway's supervisor, indicated that CSO wanted managers to return to the office on May 18, 2020. After Plaintiff submitted a note from their primary care provider indicating that Plaintiff needed to work from home for the next four weeks, Plaintiff was granted that accommodation and successfully continued to perform the essential functions of their job.

On June 19, 2020, Plaintiff's request to continue teleworking was denied. Walters' stated reason was "`that they are not approving work from home for managers since [they] need managers in the building and supporting operations.'" Walters indicated that Plaintiff's duties when they returned to the office would not differ from those that they performed at home. On June 23, 2020, Walters reiterated that Plaintiff's request to telework was denied. Plaintiff alleges that CSO did not conduct an individualized assessment of whether Plaintiff could perform the essential functions of their job via telework, or whether Plaintiff's telework would unduly burden CSO. Plaintiff did not return to the office from June 29, 2020 to July 3, 2020 and, instead, used all of their allotted leave time.

Plaintiff "reluctantly" reported to the office on July 6, 2020. With the exception of an air purifier, none of the other protective items they had requested — personal protective equipment ("PPE"), masks, hand sanitizer, and wipes — were provided. On July 7, 2020, Defendant provided Plaintiff with four KN95 masks. Plaintiff alleges that they could not effectively perform their job while wearing a mask, particularly when interacting with children. Plaintiff alleges that "working in the office has caused [them] significant hardship and emotional distress." For example, because Plaintiff believed they could not safely eat or drink in the building, they ate lunch in their car and became dehydrated during the workday. In addition, Plaintiff was exposed to people who were not wearing masks in the workplace.

On July 27, 2020, Plaintiff emailed a reasonable accommodation request to Boardway with a supporting letter from their allergist asking CSO to allow Plaintiff to resume teleworking. Boardway also provided a letter in support of Plaintiff's request stating that they could perform all their essential duties from home. On July 29, 2020, Walters informed Boardway that Plaintiff's request was denied. During a videoconference meeting on July 30, Walters told Plaintiff that CSO denied their request because "it expect[ed] all managers to work from the office." According to Plaintiff, CSO did not undertake an individual assessment of their circumstances in view of COVID-19.

Plaintiff tendered a conditional resignation on August 10, 2020 to take effect on September 5, 2020. The resignation letter indicated that it would be rescinded if Plaintiff was permitted to telework.

During a telephone call with all managers on August 27, Walters indicated that managers with children could ask to work remotely for up to two days a week. On that date, Boardway submitted a letter to Walters in support of Plaintiff's request to work from home. Boardway's

letter contained details of Plaintiff's value as a CSO employee. Based on Walters' statement and Boardway's letter, Plaintiff rescinded their resignation and renewed their telework request.

On September 1, 2020, Walters informed Plaintiff that their telework request was denied because CSO was not permitting managers to work remotely. CSO purportedly did not undertake an individualized assessment of Plaintiff's situation. Plaintiff learned that their clinical supervisor was permitted to work remotely.

In a September 1, 2020 email message to Walters, Plaintiff indicated that they would work in the office that week and would resume teleworking on September 8. Through counsel, CSO has informed Plaintiff that it "`will enforce its applicable policies'" if they try to telework on September 8. Plaintiff has interpreted that statement to mean that CSO will terminate their employment.

On September 3, 2020, Plaintiff filed a complaint claiming disability discrimination, failure to provide a reasonable accommodation, and creation of a hostile work environment, in violation of the ADA and Chapter 151B. Plaintiff has requested that the court issue a preliminary injunction requiring Defendant to permit Plaintiff to telework "for the duration of the [COVID-19] pandemic" and otherwise "to discontinue its discriminatory practices." Defendant has opposed Plaintiff's motion and has submitted the affidavit of Melody Arsenault, CSO's Senior Vice President of Human Resources and Compliance, in support of its opposition (Dkt. No. 16-1, Arsenault Aff.).

## III. LEGAL STANDARD

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of the claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013) (citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996)). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## IV. ANALYSIS

### A. Plaintiff is likely to succeed on the merits of their failure to accommodate claim.

Plaintiff claims that CSO failed to provide a reasonable accommodation for their disability (asthma) in view of COVID-19 and failed to engage in the requisite interactive process to address their request for a reasonable accommodation for their disability. "With respect to the claim of failure to accommodate, a plaintiff must demonstrate that (1) [they are] "`disabled within the meaning of the ADA, (2) [they were] able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the employer], despite knowing of [their] disability, did not reasonably accommodate it.'" *Quattrucci v. Mass. Gen. Hosp.*, CIVIL ACTION NO. 17-11250-GAO, 2020 WL 1323111, at *3 (D. Mass. Mar. 20, 2020) (third

alteration in original) (quoting *E.E.O.C. v. Kohl's Dep't Stores, Inc.,* 774 F.3d 127, 131 (1st Cir. 2014) (quotations omitted)). "`Failing to provide reasonable accommodations for a qualified employee's known physical or mental limitations constitutes discrimination, unless an employer can demonstrate that such an accommodation would impose an undue hardship.'" *Eustace v. Springfield Pub. Schs.,* Civil Action No. 17-30158-MGM, 2020 WL 2798260, at *6 (D. Mass. May 29, 2020) (quoting *Audette v. Town of Plymouth, MA,* 858 F.3d 13, 20 (1st Cir. 2017)).

"Under the third element, an employee's request for accommodation sometimes creates `a duty on the part of the employer to engage in an interactive process.'" *Kohl's Dep't Stores, Inc.,* 774 F.3d at 132 & n.5 (quoting *Enica v. Principi,* 544 F.3d 328, 338 (1st Cir. 2008)). "The employer has an obligation upon learning of an employee's disability to `engage in a meaningful dialogue with the employee to find the best means of accommodating that disability.'" *Freadman v. Metro. Prop. & Cas. Ins. Co.,* 484 F.3d 91, 104 (1st Cir. 2007) (quoting *Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 108 (1st Cir. 2005)). "The employee also has an obligation: `The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.'" *Id.* (alteration in original) (quoting 29 C.F.R. pt. 1630, app. § 1630.9). "There may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA." *Jacques v. Clean-Up Grp., Inc.,* 96 F.3d 506, 515 (1st Cir. 1996).

As to the first element, Plaintiff is likely to prevail on their contention that their asthma is a disability, at least during the COVID-19 pandemic. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

In order to determine whether a person is disabled under the ADA, the court must conduct a tripartite analysis. First, plaintiff must prove that he suffers from a physical or mental impairment. Second, the court must evaluate the life activities affected by the impairment to determine if they constitute a major life activity. Lastly, tying the two statutory phrases together, [the court] ask[s] whether the impairment substantially limits the activity found to be a major life activity.

*Rivera-Mercado v. Scotiabank De Puerto Rico-Int'l,* 571 F.Supp.2d 279, 294 (D.P.R. 2008) (citations omitted). Plaintiff's moderate asthma, as described in the complaint, qualifies as an impairment. *See Lima v. Middlesex Sheriff's Ofc.,* CIVIL ACTION NO. 19-11372-RGS, 2020 WL 823088, at *5 (D. Mass. Feb. 19, 2020). "Unobstructed breathing" qualifies as a major life activity. *Id. See Ramos-Echevarria v. Pichis, Inc.,* 659 F.3d 182, 187 (1st Cir. 2011) ("Major life activities are basic activities of daily life that an average person in the general population can perform with little or no difficulty—`functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'") (quoting 29 C.F.R. § 1630.2(i) (1991)). "Whether a plaintiff with asthma is substantially limited in his ability to work or to breathe is a fact specific question." *Murtha v. N. Y. State Gaming Comm'n,* No. 17 Civ. 10040 (NSR), 2019 WL 4450687, at *10 (S.D.N.Y. Sept. 17, 2019) (citing *Burke v. Niagara Mohawk Power Corp.,* 142 F. App'x 527, 529 (2d Cir. 2005) (noting that "asthma does

not invariably impair a major life activity")). Plaintiff alleges that, although they are under the care of several health care providers for treatment of their asthma and abide by treatment recommendations, they still have comparatively frequent asthma attacks during which they cannot breathe properly (Compl., ¶¶ 23-34). Further, Plaintiff has pled that, because of their asthma, they are at higher risk for serious illness or even death if they contract COVID-19. *See Silver v. City of Alexandria,* CASE NO. 1:20-CV-00698, 2020 WL 3639696, at *4 (W.D. La. July 6, 2020) (during the COVID-19 pandemic, whether a plaintiff has a disability should be judged by the totality of the circumstances, including the heightened risks of an impairment caused by the pandemic); *Valentine v. Collier,* Civil Action No. 4:20-CV-1115, 2020 WL 3625730, at *2 (S.D. Tex. July 2, 2020) (plaintiffs successfully pled a failure to accommodate claim where they identified disabilities that subjected them to a heightened risk of death or serious illness if they contracted COVID-19). The court finds persuasive this limited precedent addressing the standard for determining whether an individual has an impairment that substantially limits a major life activity, thus rising to the level of a disability, during this pandemic.

As to the second element, Plaintiff is also likely to be able to prove by a preponderance of the evidence that they are able to perform the essential functions of their job with or without reasonable accommodation. Plaintiff has, in their verified complaint, set forth the text of an August 27, 2020 email from their immediate supervisor detailing Plaintiff's value as a CSO employee and their ability to perform the essential functions of their job (Compl., ¶ 178).

There can be little dispute that Plaintiff requested to telework as a reasonable accommodation and that they have provided evidence, in the August 27, 2020 email from their supervisor, that they can perform the essential functions of their job remotely. *See Tobin v. Liberty Mut. Ins. Co.,* 553 F.3d 121, 136 (1st Cir. 2009) (a plaintiff bears the burden of proving that the "`proposed accommodation would enable [them] to perform the essential functions of [their] job'" and that, "at least on the face of things, [the accommodation] is feasible for the employer under the circumstances.'") (third alteration in original) (quoting *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 259 (1st Cir. 2001)). "Telework is certainly contemplated as a viable accommodation in certain circumstances." *Merrill v. McCarthy,* 184 F.Supp.3d 221, 239 (E.D.N.C. 2016) (citing *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act,* EEOC Notice No. 915.002, 2002 WL 31994335, at *24 (Oct. 17, 2002); *Work at Home/Telework as a Reasonable Accommodation,* https://www.eeoc.gov/facts/telework.html (last visited 11 April 2016)). Further, their allergist recommended teleworking as a reasonable accommodation. After Plaintiff successfully teleworked for four months, Defendant allegedly denied their request to continue teleworking on June 19, 2020, allegedly without engaging in the interactive process. Instead, CSO issued a blanket statement that all managers were required to work at CSO locations, including One Arch Street "to ensure that its programs can efficiently operate" (Arsenault Aff. ¶ 33).

CSO claims that it has accommodated Plaintiff by providing KN95 face masks, hand sanitizer and wipes, an air purifier, and separate, private work space in the CCRT program area on the second floor which has less foot traffic than the first floor (Arsenault Aff. ¶¶ 10, 20, 21). A majority of these so-called accommodations are workplace safety rules rather than an individualized accommodation to address Plaintiff's disability (Arsenault Aff. ¶ 10). CSO

indicates that, as a further accommodation, it offered Plaintiff "the use of accrued time or a personal leave of absence if they felt that they did not wish to return to the office" but Plaintiff declined to request a leave (Arsenault Aff. ¶ 24). It is difficult to see how a leave — which Plaintiff has not requested and which is generally an accommodation that should be considered when an employee needs time to recover from an impairment — would enable them to perform the essential functions of their job.

"The interactive process `requires a great deal of communication between the employee and employer.'" *Eustace,* 2020 WL 2798260, at *12 (quoting *Calero-Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 24 (1st Cir. 2004)). "The scope of the employer's obligation in this process is not crystal clear but `[t]he employer has at least some responsibility in determining the necessary accommodation,' since `the regulations envision an interactive process that requires participation by both parties.'" *Calero-Cerezo,* 355 F.3d at 24 (alteration in original) (quoting 29 C.F.R. § 1630.2(o)(3)). Plaintiff alleges that their requests to telework were denied on July 29, 2020 and September 1, 2020 without CSO's engagement in the interactive process, *see Ralph v. Lucent Techs., Inc.,* 135 F.3d 166, 171 (1st Cir. 1998) (employers have a continuing duty to provide a reasonable accommodation), and CSO has not provided evidence that it considered Plaintiff's telework request on an individualized basis. Once a plaintiff has made a showing that an accommodation seems reasonable on its face, as Plaintiff has here, "`the defendant[] then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Eustace,* 2020 WL 2798260, at *9 (alteration in original) (quoting *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401-02 (2002)). According to CSO, all managers were required to be on-site "to enforce agency rules, including COVID-19 safety rules" and to be available for an in-person response to a client if requested (Arsenault Aff. ¶ 33). CSO's submission, however, shows that there were other managers working on-site (Arsenault Aff. ¶¶ 27-31) and Plaintiff's immediate supervisor believed that they can perform the essential functions of the job while working remotely. It is unlikely that CSO will be able to show that permitting Plaintiff's request to telework would be an undue hardship. *See Garcia-Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 648 n.12, 650 (1st Cir. 2000) (reversing summary judgment for employer and granting judgment for employee where company had "simply rejected the request for the accommodation without further discussion and did so without pointing to any facts making the accommodation harmful to its business needs."). On the record before the court, it fairly appears that Plaintiff is likely to succeed on the merits of their failure to accommodate claim.[3]

## B. Plaintiff will suffer irreparable harm if the injunction is not issued.

As the court stated at the hearing, a court should be very hesitant to intrude into the employment relationship. "A federal court must find a cognizable threat of irreparable harm as an essential prerequisite to the issuance of a preliminary injunction." *Ralph,* 135 F.3d at 170. "`Though losses occasioned by employment disputes often do not rise to the level of irreparable harm,'" *id.,* "cases [nonetheless] may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Sampson v. Murray,* 415 U.S. 61, 91-92 & n.68 (1974). This is not a normal situation. Plaintiff faces the loss of their employment at a time when the unemployment rate in Massachusetts was the highest in the country (an astounding 16.1%) in

July. *See* Shirley Leung and Larry Edelman, *Economic Rebound is Stuck at Home,* BOSTON SUNDAY GLOBE, Sept. 13, 2020, at A1. In the midst of the dire economic fallout from the pandemic, CSO's optimistic pronouncements about Plaintiff's employability are less than persuasive (Arsenault Aff., ¶¶ 42-44). As Plaintiff contends, the loss of employment creates a likelihood of a cascade of further negative consequences, including, at least in the short-term, the likely loss of employer-provided health insurance. In the unusual circumstances of the pandemic, Plaintiff has adequately shown irreparable harm from the likely loss of employment in the absence of a viable accommodation.

Nor is CSO qualified to opine on the risks to Plaintiff posed by COVID-19. Plaintiff's health care provider recommended telework as a reasonable accommodation for Plaintiff's asthma and the increased risk of serious illness or even death in the event of a COVID-19 infection (Compl., ¶ 145). The risk of irreparable harm to Plaintiff — in the form of the possible serious consequences of an infection if they are not permitted to telework — cannot be discounted.

### C. The balance of hardships weighs in Plaintiff's favor.

Defendant's stated reason for refusing to permit Plaintiff to telework was that it needed managers to be present in the office to provide supervision and in-person client visits, if requested (Arsenault Aff. ¶ 33). However, Plaintiff has presented evidence that they performed the same duties on-site that they performed from home and that they are able to perform their job while teleworking as well as they could in the office. With other managers working on-site and Plaintiff's immediate manager supporting her telework request, CSO failed to articulate a hardship that outweighs the alleged hardship of requiring Plaintiff to continue reporting in person to work at One Arch Place in Greenfield (Compl., ¶¶ 122-144). Consequently, the balance of hardships weighs in Plaintiff's favor.

### D. The withholding of an injunction may have a negative impact on public health.

To the extent there is a public interest in this dispute, this factor also weighs in Plaintiff's favor. CSO performs critical work for a vulnerable population. The record shows that Plaintiff has the skills necessary to serve CCRT's clients who are victims of trauma receiving weekly therapy and support (Arsenault Aff. ¶ 35). The termination of Plaintiff's employment at an organization that provides social services to highly traumatized, at-risk clients may negatively impact public health by placing additional burdens on those who are already struggling with mental health issues.

## V. CONCLUSION

Plaintiff has sustained their burden of establishing that they are likely to succeed on the merits of their claims, that they are likely to suffer irreparable harm if they are denied the relief that they seek, that the balance of hardships weighs in their favor, and that the withholding of a preliminary injunction may have a negative impact on public health. The court grants Plaintiff's motion for a preliminary injunction (Dkt. No. 2) on the following terms: Plaintiff is entitled to telework as a reasonable accommodation pursuant to the ADA and Chapter 151B for sixty (60) days or until further order of the court. During this period of time, CSO is entitled to seek further

medical documentation concerning Plaintiff's alleged disability. The parties are strongly encouraged to discuss a mutually acceptable resolution of their dispute. A status conference has been scheduled on October 8, 2020 at 10:00 A.M.

It is so ordered.

**FootNotes**


1. Plaintiff moved for expedited discovery in support of their motion for preliminary injunctive relief (Dkt. No. 10). In view of the court's ruling on Plaintiff's motion for injunctive relief, Plaintiff has withdrawn this request and assented to an order from the court denying this motion without prejudice. This order will be separately docketed.
2. Unless otherwise stated, the background facts are drawn from the verified complaint (Dkt. No. 1).
3. Because "`Chapter 151B tracks the ADA in virtually all [relevant] respects,'" Plaintiff's claims under that statute are not addressed separately. *Boadi v. Ctr. for Human Dev., Inc.,* 239 F.Supp.3d 333, 349 (D. Mass. 2017) (quoting *Smith v. Pub. Schs. of Northborough-Southborough,* 133 F.Supp.3d 289, 295 (D. Mass. 2015)).